UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHELLY GARLITZ,

        Plaintiff,

                                            Case Number 10-13874-BC

v.                                       Honorable Thomas L. Ludington

ALPENA REGIONAL MEDICAL CENTER,
KATHY HIMES, and DIANE SHIELDS,

        Defendants.

_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This employment dispute arises out of a medical examination administered to Plaintiff Shelly Garlitz as a condition of her accepting employment with Defendant Alpena Regional Medical Center. It is undisputed that the examination did not go well; the dispute centers on why Defendant then rescinded its offer of employment to Plaintiff. Plaintiff contends that it was rescinded because she refused to answer questions posed in the exam about pregnancy, abortion, sexual activity, birth control, and similar subjects — all of which were posed only to female applicants — and because she complained of these questions to Defendants. Defendants contend that the offer was revoked because of Plaintiff's "attitude" — they thought her "rude."

Alleging violations of the Americans with Disabilities Act, Title VII (as amended by the Pregnancy Act of 1978), the Elliot-Larsen Civil Rights Act, and 42 U.S.C. § 1983, Plaintiff brings suit in this Court against Alpena; its vice president of human resources, Defendant Diane Shields; and its recruiter, Defendant Kathy Himes. Defendants now move for summary judgment. For the following reasons, the motion will be granted in part and denied in part.

**I.**

Alpena is an acute-care medical facility employing more than nine hundred people. Plaintiff worked for Alpena as a medical technologist from 1995 to 2007.  During this twelve year period, she generally received positive reviews.  Defendants' emphasize, however, that "[h]er 2003 evaluation noted that she had 'interpersonal difficulties' with co-workers."  Defs.' Br. Supp. Mot. Summ. J. 2, ECF No. 22 ("Defs.' Br.").  In pertinent part, the 2003 evaluation provides: "[Plaintiff] continues to perform quite well.  Has worked through some interpersonal difficulties with coworkers which seem resolved.  She has good knowledge [and] work habits." Defs.' Mot. Ex. 2.

In May 2007, Plaintiff left Alpena to complete school and to work as a travelling medical technologist.  Her "termination of employment evaluation" rated her quality of work, industry, and initiative as "excellent" (the highest of four possible ratings), her character and attitude as "good" (the second highest possible rating), and recommended her for rehire.  Pl.'s Opp'n Mot. Summ. J. Ex. 1, ECF No. 24-2.

About a year later, Plaintiff decided to reapply to Alpena.  On July 18, 2008, she completed an employment application for a "per diem" job.  The following week, Defendant Himes, Alpena's recruiter, called Plaintiff and arranged a meeting.  On July 23, the two ladies met.  Himes described Plaintiff's behavior as "slightly condescending, very bold, very matter of fact, just rude."  Himes Dep. 74:3–5, June 8, 2011, *attached as* Defs.' Mot. Ex. 4.  That day, Himes "offered [Plaintiff] the per diem job to commence on July 30 subject to completion of a drug test and a medical examination."  Defs.' Br. 2.

Prior to the medical examination, Alpena provided Plaintiff with a medical history form (Alpena form).  *See* Defs.' Mot. Ex 6.  The Alpena form, which asks general questions about an

applicant's medical history, instructs: "You have received an offer of employment conditioned on your satisfactory completion of a health assessment. The purpose of this assessment is to determine whether you currently have the physical and mental qualifications necessary to perform the job that has been offered." *Id*.

Alpena also scheduled Plaintiff's medical examination at HealthWise Medical Clinic, an independently owned clinic. Inquiring into the relationship between Alpena and HealthWise, Plaintiff's counsel asked in Himes's deposition:

> Q:  . . . [H]ow would you describe the relationship with HealthWise Medical Center when you were the recruiter?
> A: The hospital's relationship?
> Q: Yes.
> A: Very professional.
> Q: Was it a — a contractual relationship?
> A: I believe so.  I do not know.
> Q: Okay.  Did they — is HealthWise part of the hospital?
> A: No.
> Q: You contracted with them to — to do physicals?
> A: Correct.

Himes Dep. 19:15–20:1.  Elsewhere in her deposition, Himes was asked:

> Q:  During the time that you were there at Alpena Regional Medical Center as a recruiter, is HealthWise Medical Center the only place where you're aware of that preemployment physicals took place?
> A: No.
> Q: During the time you were there?
> A: No.
> Q: Where — where else were employees sent?
> A:  Occasionally they could be sent to Alpena Medical Arts, only if HealthWise could not get them in.

Himes Dep. 12:19–13:3, *attached as* Pl.'s Opp'n Ex. 10, ECF No. 25-11.  Kassandra Lechel, one of the two owners of HealthWise, clarifies that HealthWise and Alpena have an oral contract to supply preemployment medical examinations to Alpena.

When Plaintiff arrived for her appointment at HealthWise on July 29, she was presented with a second medical history form (HealthWise form).  *See* Defs.' Mot. Ex. 7, ECF No. 22-8. The HealthWise form also asks a series of general questions about an applicant's medical history.  It goes on, however, in a separate section titled "**Females** — *Please Complete*," to ask:

- Pregnant?
- Planning Pregnancy[?]
- Menstrual Flow[?]
- Date 1st Day of Last Period[?]
- Pain / Bleeding During or After Sex[?]
- Number of: Pregnancies __ Abortions __ Miscarriages __ Live Births __
- Birth Control Method[?]
- B.C. Pill (Name) [?]
- Date of Last PAP Test[?]
- Date of Last Mammogram[?]

*Id*.  (emphasis in original).  Plaintiff initially refused to answer these questions, informing the receptionist: "I didn't feel those were relevant to a preemployment physical."  Pl.'s Dep. 52: 17–18, Mar. 22, 2011, *attached as* Pl.'s Opp'n Ex. 4 24–5.  Plaintiff was then escorted back to an examination room.

A short time later, Lechel entered.  A nurse practitioner, Lechel worked at Alpena from about 1995 to 2005 and co-founded HealthWise in 2006.  Lechel notified Plaintiff that she would not pass her medical examination unless she completed all the questions on the HealthWise form.  *See* Pl.'s Dep. 53:1–5.  Lechel explained in her deposition that "as long as we got the information, then that would not be a problem.  That has happened multiple times in the past and then we hire the people."  Lechel Dep. 61:22–24, June 7, 2011, *attached as* Pl.'s Opp'n Ex 10, ECF No. 25-11.  Plaintiff recounts what happened next:

> [S]he said she's not passing me unless I fill it out.  At that time I just said, "Fine, you know, if that is the case." . . .  At which point I started to fill out some of the papers.  Again, I got to the point where the issues about whether I plan on having

-4-

children, birth control, and all those questions, I didn't feel that was relevant, I did
not fill all those out.

Pl.'s Dep. 54:23–55:8.  Lechel then conducted a medical examination of Plaintiff; it lasted about

five minutes.  In her deposition, Lechel discussed her impression of Plaintiff, recalling that "she

was very paranoid and very guarded, somewhat questionably delusional."  Lechel Dep. 57:16–

17.  At the conclusion of the examination, Lechel approved Plaintiff for work.

After Plaintiff left HealthWise, Lechel called Alpena and spoke with Himes:  "I said I

would like to be able to pass this person but she withheld information, and I was concerned that

she was withholding information about her health and that we had requested information about

her history."  Lechel Dep. 61:18–22.

Himes called Plaintiff and told Plaintiff not to come in the following day, July 30, 2008.

Notwithstanding this instruction, Plaintiff came into Himes's office.  Plaintiff asserts that after

she arrived: "I explained that Casey Lechel and I — that I felt there was a 'power play,' were my

words, I believe, saying — because I didn't want to answer the questions about, you know,

again, female genecological [sic] issues."  Pl.'s Dep. 69:12–16.  That same day, Himes sent

Plaintiff a letter revoking the offer of employment. The letter provided:

> Dear Shelly,
>
> This letter is to serve as official notification to you as it relates to your offer of
> employment as a Medical Technologist with Alpena Regional Medical Center.
>
> Based on preemployment guidelines and your denial [sic] to complete the
> requirements, Alpena has opted to withdrawal [sic] our offer of employment.
>
> Thank you for your interest in returning to Alpena Regional Medical Center.  We
> wish you well in all your endeavors.
>
> Sincerely,
> Kathy Himes
> Recruiter

Pl.'s Opp'n Ex. 12, ECF No. 25-13.  Defendants caution in their brief, however, "that the letter

was not an accurate reflection of why [they] decided to withdraw the offer."  Defs.' Br. at 7.

Rather, Defendants explain: "The decision was solely because of the attitude that [Plaintiff]

demonstrated in her interaction with Alpena staff and HeathWise."  *Id*. 6.  Plaintiff disagrees,

believing her offer was rescinded, at least in part, for the reasons referenced in the letter — her

refusal to answer questions on the HealthWise form.  In Plaintiff's deposition, for example,

Defendants' counsel inquired:

> Q:  You don't have any reason to think that they withdrew your offer of
>      employment because you're a woman?
> A:  Not because I'm a woman.
> Q:  Do you have reason to think that they withdrew your offer of employment
>      because of your refusal to answer questions about pregnancy?
> A:  That is just one question.  So that would be a yes about that.
> Q:  Okay. What is it that causes you to think that your refusal to answer a question
>      about pregnancy was a factor in the decision to withdraw your offer of
>      employment?
> A:  Because that is what I complained about being — the reason I didn't want to
>      fill out these forms, the big factor.
> Q:  So in other words, the conversation you had with Kathy Himes that you
>      described earlier?
> A:  The conversation I had with Kathy was, I described earlier, that I objected to
>      Kathy Lechel [sic] about these types of questions.  And she was upset because
>      I objected to these things.

Pl.'s Dep. 101:20–102:14.

In September 2010, Plaintiff filed suit in this Court.  Following a stipulated order

permitting amendment, Plaintiff filed a six-count amended complaint.  Count one asserts that

Defendants violated the Americans with Disabilities Act as they asked questions unrelated to her

essential job functions in a preemployment medical examination.  Count two asserts that

Defendants violated Title VII of the Civil Rights Act of 1964.  Counts three and four assert that

Defendants violated the Elliott-Larsen Civil Rights Act as they retaliated and discriminated

against Plaintiff. Counts five and six assert that Defendants violated 42 U.S.C. § 1983 by infringing on Plaintiff's Fourteenth Amendment right to privacy and her First Amendment right to report a matter of public concern. Defendants now move for summary judgment on each of Plaintiff's claims. ECF No. 22.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). In viewing the evidence, the Court must draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.

The Americans with Disabilities Act (ADA) prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Section 12112 provides in pertinent part:

    2.  Preemployment
        A.  Prohibited examination or inquiry.  Except as provided in paragraph (3), a
           covered entity shall not conduct a medical examination or make inquiries
           of a job applicant as to whether such applicant is an individual with a
           disability or as to the nature or severity of such disability.
        B.  Acceptable inquiry.  A covered entity may make preemployment inquiries
           into the ability of an applicant to perform job-related functions.

    3.  Employment entrance examination.  A covered entity may require a medical
       examination after an offer of employment has been made to a job applicant
       and prior to the commencement of the employment duties of such applicant,
       and may condition an offer of employment on the results of such examination.

42 U.S.C. §§ 12112(d)(2)–(3).  Thus, the ADA prohibits an employer from requiring an applicant to undergo a "preemployment" medical examination, unless it is focused on "the ability of the applicant to perform job-related functions."  42 U.S.C. § 12112(d)(2); *see* 29 C.F.R. § 1630.14(a); *O'Neal v. City of New Albany*, 293 F.3d 998, 1008 (7th Cir. 2002).  Once an employer has made an offer of employment to an applicant, however, the ADA permits employers to require an "employment entrance examination" in which they may inquire into a range of topics unrelated to job-related functions.  42 U.S.C. § 12112(d)(3).

       "Offer" is strictly construed in this context — the offer must be "real."  *O'Neal*, 293 F.3d at 1008.  "For purposes of § 12112(d)(3), a job offer is real if the employer has evaluated all relevant non-medical information that it reasonably could have obtained and analyzed prior to giving the offer."  *Id.* (internal quotation marks omitted) (quoting *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 138 (D. Mass. 1998)).  As the Equal Employment Opportunity Commission (EEOC) explains:

       The ADA recognizes that employers may need to conduct medical examinations
       to determine if an applicant can perform certain jobs effectively and safely. The
       ADA requires only that such examinations be conducted as a separate, second
       step of the selection process, after an individual has met all other job pre-
       requisites.

*EEOC Technical Assistance Manual on the Employment Provisions of the ADA*, VI-4 (1992), *quoted in Leonel v. Am. Airlines*, 400 F.3d 702, 709 (9th Cir. 2005).[1]  "Of course," the EEOC cautions, "there are times when an employer cannot reasonably obtain and evaluate all non-medical information at the pre-offer stage.  If an employer can show that is the case, the offer would still be considered a real offer." *ADA Enforcement Guidance: Preemployment Disability–Related Questions and Medical Examinations*, EEOC Notice 915.002 (October 10, 1995), *reprinted in* EEOC Compl. Man. (CCH) ¶ 6903, at 5371, 5378.  Consequently, the burden is on the employer to demonstrate that it took reasonable steps to obtain and evaluate all non-medical information before making an offer conditioned on the successful completion of a post-offer examination.

 If a "real" offer has been made, the "post-offer examination does not have to be job-related." *O'Neal*, 293 F.3d at 1008 (citing 29 C.F.R. § 1630.14(b)(3)); *see also Miller v. City of Springfield*, 146 F.3d 612, 615 (8th Cir. 1998) (same)).

In this case, Defendants assert that the decision to revoke Plaintiff's offer "was solely because of the attitude that [Plaintiff] demonstrated in her interaction with [Alpena] staff and HeathWise."  Defs.'  Br. 6.  Crucially, however, Defendants do not assert — much less demonstrate as a matter of law — that they could not reasonably obtain information regarding Plaintiff's non-medical "attitude" problem before Defendants extended the conditional offer.

Consequently, Plaintiff is correct that a question of fact exists as to whether a "real offer" was made to Plaintiff.  Although Defendants provided Plaintiff with a form that provided "[y]ou

---

[1] The EEOC's administrative interpretations, though not binding on the courts, "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav'g Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

have received an offer of employment conditioned on your satisfactory completion of a health assessment," Defs.' Mot. Ex. 6, Defendants' own brief demonstrates that they may not have evaluated all reasonably available non-medical information at the time the offer was made. Likewise, although the letter rescinding Plaintiff's offer provides that "[b]ased on preemployment guidelines and your denial [sic] to complete the requirements, [Alpena] has opted to withdrawal [sic] our offer of employment," Pl.'s Opp'n Ex. 12, Defendants' own brief asserts that Plaintiff's offer was revoked not because she did not complete the HealthWise form, but because of her "temperament." Defs.' Br. 11.

Of course, Defendants' claim is based at least in part on Plaintiff's behavior at HealthWise, where Lechel found Plaintiff "very paranoid and very guarded, somewhat questionably delusional." Lechel Dep. 57:16–17. Importantly, however, Defendants' claim is not limited to conduct after the offer was made. They do not allege that information about Plaintiff's "temperament" was not reasonably available before they made the offer to her — indeed, in their brief they emphasize that "[h]er 2003 evaluation noted that she had 'interpersonal difficulties' with co-workers." Defs.' Br. 2. Thus, a material question of fact exists about whether Plaintiff received a "real" offer within the meaning of 42 U.S.C. § 12112(d)(3). Defendants are not entitled to summary judgment on Plaintiff's ADA claim.

Seeking to avoid this conclusion, Defendants argue that "to hold that once an offer is made and the medical exam takes place, the offer is not real if it is revoked for any reason other than failing the medical exam . . . is not supported by any legal authority and would lead to absurd results." Defs.' Reply Br. 2, ECF No. 26. To illustrate the absurdity, Defendants offer the following hypothetical:

-10-

> [S]uppose that [Plaintiff] had stormed out of the HealthWise Clinic, marched over
> to [Alpena] and physically assaulted Himes because she was so offended by the
> questions she was asked at the physical exam.  Does she seriously contend that if
> she passed the physical, the ADA prohibits [Alpena] from revoking her offer of
> employment for such conduct?  That is simply not the law.

*Id.*  Defendants' are correct — of course — that is not the law.  But Defendants' hypothetical is

also inapposite; it bears no parallel to the facts of this case.

As discussed above, to defend against an alleged violation of § 12112(d)(2), the employer

need only demonstrate that it took reasonable steps to obtain and evaluate non-medical

information before making the offer pursuant to § 12112(d)(3).  In Defendants' hypothetical, the

reason the offer was revoked occurred only after the offer was made.  In this case, in contrast,

Defendants argue that the offer was revoked because of Plaintiff's "attitude," a problem which

they trace as far back as 2003.  They do not argue that this non-medical information was

unavailable before the offer was made or that they took reasonable steps to obtain and evaluate

all non-medical information before making the offer.  Accordingly, Defendants have not carried

their burden of demonstrating that Plaintiff's offer was "real."

Similarly unpersuasive is Defendants' argument that "[t]here is simply no indication that

[Defendants] perceived [Plaintiff] to suffer from a disability as defined by the ADA."  Defs.' Br.

10.  To bring a claim under § 12112(d), plaintiffs are not required to allege that they suffer from

a disability as defined by the ADA or that they were discriminated against because of a

disability.  Put simply, "A plaintiff need not prove that he or she has a disability in order to

contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d)."  *Lee v. City of

Columbus*, 636 F.3d 245, 252 (6th Cir. 2011); *accord Harrison v. Benchmark Elecs. Huntsville,

Inc.*, 593 F.3d 1206, 1216 (11th Cir. 2010) ("Normally, as part of his prima facie case of

discrimination under the ADA, a plaintiff must show that he is a qualified individual with a

disability. Since we have held that such a requirement is not a prerequisite to suit under §
12112(d)(2), such a showing cannot be required.").

This rule is derived from the very purpose of § 12112(d). "The obvious purpose of
subsection (d) is to limit the gathering and use of medical information as one of the ways to
reduce the possibility of discrimination." *Heston v. Underwriters Labs., Inc.*, 297 F. Supp. 2d
840, 845 (M.D.N.C. 2003). As the Tenth Circuit explains, "It makes little sense to require an
employee to demonstrate that he has a disability to prevent his employer from inquiring as to
whether or not he has a disability." *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124
F.3d 1221, 1229 (10th Cir. 1997). As noted above, Defendants are not entitled to summary
judgment on this claim.

## IV.

### A.

"It shall be an unlawful employment practice for an employer," Title VII provides, "to
discriminate against any individual with respect to his compensation, terms, conditions, or
privileges of employment, because of such individual's race, color, religion, sex, or national
origin." 42 U.S.C. § 2000e-2(a)(1). Accordingly, "Under Title VII, overt gender-based
discrimination can only be countenanced if sex is a bona fide occupational qualification
reasonably necessary to the normal operation of a particular business or enterprise." *Grant v.
Gen. Motors Corp.*, 908 F.2d 1303, 1306 (6th Cir. 1990) (internal alterations and quotation
marks omitted) (quoting 42 U.S.C. § 2000e–2(e)(1)).

Initially, the Supreme Court interpreted the prohibition on overt sex discrimination on the
basis of pregnancy narrowly, holding that "an exclusion of pregnancy from a disability-benefits
plan providing general coverage is not gender-based discrimination at all." *Gen. Elec. v. Gilbert*,

-12-

429 U.S. 125, 136 (1976), *superseded by statute*, Pregnancy Discrimination Act of 1978, Pub. L.

No. 95-555, 42 U.S.C. § 2000e(k), *as recognized in Newport News Shipbuilding & Dry Dock v.*

*E.E.O.C*., 462 U.S. 669, 678 (1983).

The congressional response to *Gilbert* was swift. Abrogating its holding with the passage

of the Pregnancy Discrimination Act of 1978 (PDA), Congress amended Title VII to add:

> The terms "because of sex" or "on the basis of sex" [in Title VII] include, but are
> not limited to, because of or on the basis of pregnancy, childbirth, or related
> medical conditions; and women affected by pregnancy, childbirth, or related
> medical conditions shall be treated the same for all employment-related purposes
> as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k).[2] *See Newport News*, 462 U.S. at 678 ("When Congress amended Title VII

in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the

Court in the *Gilbert* decision."). The legislative history explains:

> In using the broad phrase "women affected by pregnancy, childbirth, and related
> medical conditions," the bill makes clear that its protection extends to the whole
> range of matters concerning the childbearing process. . . . Until a woman passes
> the child-bearing age, she is viewed by employers as potentially pregnant.
> Therefore, the elimination of discrimination based on pregnancy in these
> employment practices will go a long way toward providing equal employment
> opportunities for women, the goal of Title VII of the Civil Rights Act of 1964.

H.R. Rep. No. 95–948, 95th Cong., 2d Sess. 5–7, *reprinted in* 1978 U.S.C.C.A.N. 4749, 4753–

59. *See generally* Samuel Issacharoff & Elyse Rosenblum, *Women and the Workplace:*

*Accommodating the Demands of Pregnancy*, 94 Colum. L. Rev. 2154, 2179–81 (1994)

(discussing policy goals animating implementation of PDA).

---

[2] The Elliot-Larsen Civil Rights Act contains similar prohibitions against an employer discriminating against an employee on the basis of an employee's sex, defining "sex" in pertinent part to include "pregnancy, childbirth, or a medical condition related to pregnancy or childbirth." Mich. Comp. Laws § 37.2201. Likewise, for analytical purposes, the ELCRA resembles federal law and the same general evidentiary burdens prevail as in Title VII cases. *See In re Rodriquez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp*., 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172-73 (1998).

Accordingly, "[interview] questions about pregnancy and childbearing [are] unlawful per se in the absence of a bona fide occupational qualification." *King v. Trans World Airlines*, 738 F.2d 255, 258 n.2 (8th Cir. 1984); *accord Barbano v. Madison Cnty.*, 922 F.2d 139, 143 (2d Cir. 1990) (holding that questioning a job applicant "about whether she would get pregnant and quit was also discriminatory, since it was unrelated to a bona fide occupational qualification"). Similarly, in *UAW v. Johnson Controls*, 499 U.S. 187 (1991), the Court was unpersuaded that an employer's "fetal protection policy" that prohibited women of childbearing age from holding positions in which they would have significant exposure to lead violated the PDA. *Id.* at 211. Concluding that the policy was facially discriminatory it because did not consider the effects that lead exposure might have on reproducing males and was not based on bona fide occupational qualifications, the Court explained: "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Id.* at 200. The Court concluded: "Concern for a woman's existing or potential offspring historically has been the excuse for denying women equal employment opportunities. Congress in the PDA prohibited discrimination on the basis of a woman's ability to become pregnant. We do no more than hold that the PDA means what it says." *Id.* at 211 (internal citation omitted) (citing *Muller v. Oregon*, 208 U.S. 412 (1908)).

Here, the undisputed evidence demonstrates that Plaintiff was terminated in part because of her "attitude" in refusing to answer questions regarding, inter alia, whether she was pregnant, had ever been pregnant, or was planning to become pregnant; whether she had ever had an abortion, miscarriage, or live birth, and if so, how many times; and whether she was on birth control and, if so, what type. Men were not asked to complete these questions.

-14-

**B.**

Defendants do not contest that the HealthWise form is facially discriminatory.[3]  Rather, Defendants make two alternative arguments regarding why they believe that they are entitled to summary judgment — that Plaintiff cannot establish causation and that Defendants are not responsible for the questions posed in the HealthWise form.  For the reasons discussed below, neither argument is persuasive.

**1.**

First, Defendants argue, Plaintiff cannot establish causation because Plaintiff conceded in her deposition that the decision was not made "because I'm a woman."  Def.'s Br. 12.  To support their argument, Defendants rely on the following exchange in Plaintiff's deposition:

> Q:  You don't have any reason to think that they withdrew your offer of employment because you're a woman?
> A:  Not because I'm a woman.

Pl.'s Dep. 101:20–22, *quoted in* Defs.' Br. 12.  Defendants' brief does not address, however, the next three questions asked and answered in Plaintiff's deposition:

> Q:  Do you have reason to think that they withdrew your offer of employment because of your refusal to answer questions about pregnancy?
> A:  That is just one question.  So that would be a yes about that.
> Q:  Okay.  What is it that causes you to think that your refusal to answer a question about pregnancy was a factor in the decision to withdraw your offer of employment?
> A:  Because that is what I complained about being — the reason I didn't want to fill out these forms, the big factor.

---

[3]  In the reply brief, Defendants do assert that "requiring medical examiners to ignore the difference between men and women would promote gender inequality."  Defs.' Reply Br. 4.  Defendants continue: "A medical exam is permitted to identify conditions unique to either gender so that employers can make the necessary accommodations to assure both genders equal access to the workplace."  *Id*.  Defendants do not explain, however, why questions regarding, for example, what birth control methods the applicant utilizes or whether an applicant plans to have a child are "conditions unique" to women.  Additionally, Defendants concede that some of the questions Plaintiff objected to in the HealthWise form were not job related.  *See, e.g.*, Shields Dep. 31:7–15 (acknowledging that whether a woman had an abortion in the past or is on birth control is not relevant to whether the woman is able to perform the essential functions of a medical technologist at Alpena).

Q:   So in other words, the conversation you had with Kathy Himes that you described earlier?

A:   The conversation I had with Kathy was, I described earlier, that I objected to [Lechel] about these types of questions.  And she was upset because I objected to these things.

Pl.'s Dep. 101:23–102:14.  Under Title VII's express terms, of course, "on the basis of sex" in Title VII includes "on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  Accordingly, Plaintiff need not allege that she was discriminated against because she was a woman — claiming that she was treated differently because of pregnancy-related issues is sufficient.  Defendants' lack of causation argument is unpersuasive.

**2.**

Defendant's second argument presents a closer question — Defendants argue that they cannot be held liable for questions contained in the HealthWise form because "HealthWise is a company unrelated to [Alpena]" and "Defendants did not direct HealthWise to ask the questions about pregnancy."  Defs.' Br. at 4, 12.  As explained below, however, a genuine issue of material fact exists as to whether HealthWise was Alpena's agent for purposes of the preemployment medical examinations.

Title VII defines "employer" in pertinent part as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person."  42 U.S.C. § 2000e(b).  The Sixth Circuit acknowledges that it, like its fellow circuits, "has not comprehensively explained the legal theories by which to identify 'employers' under the Civil Rights Acts."  *Satterfield v. Tennessee*, 295 F.3d 611, 617 (6th Cir. 2002). "Instead," the court explains, "we appear to have three lines of cases setting out three theories."  *Id*.  The theory pertinent to these facts "recognize[s] that an agent of an employer may be identified as an employer for the purposes of the Civil Rights Acts if the employer delegated employment

decisions to the agent." *Id.* (citing *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 996 (6th Cir. 1997); *York v. Tenn. Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir. 1982)).[4]

In *Swallows*, for example, the court concluded that a campus bookstore operated by Barnes & Noble was not an "agent" of the university because the school "did not delegate to Barnes & Noble the authority to make employment decisions on its behalf, nor did it exercise the requisite control over Barnes & Noble's employment decisions." *Swallows*, 128 F.3d at 996. Elaborating on its holding, the court noted that because "agent" was not a defined term under the Civil Rights Acts, "we look to the common law of agency" under which "[a]n agent is one who consents to act on behalf of another and subject to the other's control." 128 F.3d at 996, 996 n.7 (citing *Restatement (Second) of Agency* § 1 (1958)); *see Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72 (1986) (holding that in Title VII cases, "Congress wanted courts to look to agency principles for guidance"); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 754–55 (1998) (holding that in Title VII cases, courts should "rely on the general common law of agency, rather than on the law of any particular State, to give meaning to these terms." (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989)).

As generally defined by the *Restatement*, "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf

---

[4] The first of the other two theories is the traditional measure of an employment relationship, which considers "the entire relationship, with the most important factor being the employer's ability to control job performance and employment opportunities of the aggrieved individual." *Id.* (quoting *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 319 (6th Cir. 2001)).

The second theory holds that "Title VII does not require a formal employment relationship between the plaintiff and the defendant. Rather, a plaintiff is protected if the defendant is one who significantly affects access of any individual to employment opportunities." *Id.* (quoting *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 875 (6th Cir. 1991)). Neither of these two theories are alleged in this case.

and subject to his control, and consent by the other so to act." *Restatement (Second) of Agency* §

1. Regarding the principal's control of the agent, the *Restatement* elaborates:

> The right of control by the principal may be exercised by prescribing what the
> agent shall or shall not do before the agent acts, or at the time when he acts, or at
> both times. The principal's right to control is continuous and continues as long as
> the agency relation exists, even though the principal agreed that he would not
> exercise it.

*Id.* § 14 cmt. a.

In this case, Alpena delegated to HealthWise the authority to make certain aspects of

Alpena's employment decisions.  Defendants notified Plaintiff that she must pass the HealthWise

medical examination to receive the job with Alpena. *See, e.g*., Himes Dep. 85:13–23 (noting that

when Plaintiff said she was going to her primary care physician because she was upset about the

questions asked by HealthWise, Himes "made the phone call to his office to tell them it was not

authorized").   And Lechel, the co-owner of HealthWise, informed Plaintiff that "she's not

passing me *unless* I fill [the HealthWise form] out."  Pl.'s Dep. 54:23 (emphasis added).  After

Plaintiff left HealthWise, Lechel called Alpena and spoke with Himes:  "I said I would like to be

able to pass this person but she withheld information." Lechel Dep. 61:18–19.  Elaborating in her

deposition, Lechel explained, "as long as we got the information, then that would not be a

problem.  That has happened multiple times in the past and then we hire the people."  Lechel

Dep. 61:22–24.

Moreover, Himes testified, the relationship between Alpena and HealthWise was

essentially exclusive.  She was asked:

> Q:  During the time that you were there at Alpena Regional Medical Center as a
>      recruiter, is HealthWise Medical Center the only place where you're aware of
>      that preemployment physicals took place?
> A:  No.
> Q:  During the time you were there?

> A:  No.
> Q:  Where — where else were employees sent?
> A:  Occasionally they could be sent to Alpena Medical Arts, only if HealthWise could not get them in. . . .
> Q:  Okay.  And is the reason Alpena Regional Medical Center sent preemployment applicants to a physical to determine whether they — the individual was — was medically approved for work pending drug test results?
> A:  Yes.

Himes Dep. 12:19–13:3, 47:1–4.  In formal contract terms, of course, this is a description of an informal requirements contract for services, with Alpena agreeing to purchase all of its preemployment screenings from HealthWise, subject to HealthWise's capacity limitations.  In practical terms, Defendants' testimony establishes that they delegated some hiring decisions to HealthWise.

The closer issue is how much control Defendants retained over HealthWise's preemployment screening practices.  Here again, the evidence establishes that Defendants are not entitled to judgment as a matter of law.  Lechel, for example, testified that she had discussed modifying the medical history questionnaires with Alpena before changes were made to the form.  Lechel Dep. 30:5–31:4.  In her deposition, Lechel was asked:

> Q:  . . . And so when you began doing the preemployment physicals for Alpena Regional Medical Center, was the form the same as Exhibit 1[5] with the exception that it did not include emotional status?
> A:  I believe so, yes.
> Q:  And when was that added?
> A:  Approximately four years ago.
> Q:  Okay. So did you have a discussion with Alpena Regional Medical Center about adding emotional status?
> A:  I did.
> Q:  And who did you talk to?
> A:  I do not recall.

---

[5] It is not clear from the record which form this refers to — the Alpena form or the HealthWise form.  In either event, however, it demonstrates that the relationship between the entities may be more than customer – vendor; it may be principal – agent.

-19-

Lechel Dep. 30:5–16.  Later in her deposition, Lechel was asked:

> Q:  And by July of 2008, you had had at least over a two-year relationship with
>     Alpena Regional Medical Center, correct?
> A:  Yes.
> Q:  And they knew the information that you got during your — your
>     preemployment exams, correct?
> A:  We worked together to be able to provide the best information to understand
>     the patient to the best of our ability.

Lechel Dep.  65:4–13.  In contrast, Shields, Alpena's vice president of human resources, denies

that Alpena ever discussed the purpose — much less the content of the physical exams — with

HealthWise.  In her deposition, Shields was asked:

> Q: . . . Your office has — the human resource office has had discussions with
>    those medical facilities [that contract with Alpena to perform medical
>    examinations], I assume?
> A: Regarding how they do a physical?
> Q: Just regarding physicals — the purpose of the physicals.
> A: No.
> Q: Alright.  Has Alpena Medical Center communicated to HealthWise the reason
>    — the purpose for the physical?
> A: No.

Shields Dep. 24:4–11, June 8, 2011, *attached as* Pl.'s Opp'n Ex. 5, ECF No. 25-6.  It is of course

possible that Alpena had an exclusive, ongoing arrangement with HealthWise to receive medical

examinations and yet never communicated with Healthwise about the reason it was sending a

steady stream of individuals to HealthWise for physical examination — that is, it is possible that

Alpena never communicated the reason it was paying HealthWise to conduct these physicals, the

reason it wanted these individuals to receive physicals, the type of information Alpena wished to

obtain from the physicals, or Alpena's purpose in entering into the exclusive, ongoing

arrangement with HealthWise to have HealthWise provide physicals.  Such a possibility,

however, is in considerable tension with the testimony of both Lechel and Himes.  Lechel, as

noted above, testified that Alpena and HealthWise had worked together to develop the content of

the physical exams.  Likewise, in Himes deposition she was asked:

> Q:  . . . What's the purpose of them going [to HealthWise]?
> A:  To be cleared for work.
> Q:  Okay. Medically cleared?
> A:  Yes.
> Q:  Okay. Do you — in your position as the recruiter, what does medically
>     cleared mean?
> A:  There was a checklist that was provided to [HealthWise] to answer for us.
> Q:  In determining whether the employee was medically cleared, did you want to
>     determine, as the employer, whether that individual would medically be able
>     to perform the essential functions of his or her position with Alpena Regional
>     Medical Center?
> A:  Yes.

Himes Dep. 21:2–16.  In sum, an issue of fact exists as to the degree of control Alpena exercised

over HealthWise's preemployment screening procedures.  And, of course, the actual exercise of

control is not essential to create an agency relationship — the relationship is created if a

purported principal "has the right to control the conduct of the agent with respect to matters

entrusted to him."  *Restatement (Second) of Agency* § 14.   Here, an issue of fact also exists as to

whether Alpena had the right to control the manner in which HealthWise administered the

preemployment screening procedures.  Accordingly, Defendants are not entitled to summary

judgment on Plaintiff's pregnancy discrimination claims brought pursuant to Title VII and the

Elliot-Larsen Civil Rights Act (ELCRA).

## V.

Count three of the complaint brings a claim for a violation of the ELCRA, contending

that Defendants retaliated against Plaintiff for reporting Defendants' discrimination.  Moving for

summary judgment on the claim, Defendants assert that they could not have retaliated "because

none knew of her allegedly-protected expression until after the challenged employment action

had been made." Defs.' Br. 13. Plaintiff does not respond to this argument. The Sixth Circuit instructs that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 406 (6th Cir. 1992). Accordingly, Defendants are entitled to summary judgment on Plaintiff's ELCRA retaliation claim.

Moreover, an independent review of the record demonstrates that the undisputed evidence is that Defendants' drafted the letter revoking Plaintiff's employment before she complained to them about the questions contained in the HeathWise form. On July 30, 2008, Himes sent a letter revoking the offer of employment to Plaintiff. The same day, Plaintiff came to Himes's office and complained about the questions contained in the HeathWise form. Himes asserts that the decision to revoke the offer of employment was made before Plaintiff arrived. In Himes's deposition, for example, Plaintiff's counsel inquired:

> Q: So when [Plaintiff] met you at the office shortly after you arrived for work, she had told you that she had — did she tell you that she had a disagreement with Casey at HealthWise?
> A: Not until after I told her that we had withdrawn our offer of employment.

Himes Dep. 50:15–20. Plaintiff disagrees with when she was notified that the offer was withdrawn — she concedes, however, that on July 30 she was informed that she would get a letter informing her of "what was going on." Pl.'s Dep. 78:13–15.

"[T]o withstand a properly supported motion for summary judgment, plaintiff must do more than rely merely on the allegations of her pleadings . . . she is obliged to come forward with specific facts . . . showing that there is a genuine issue for trial." *Chappell v. City Of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (internal quotation marks omitted). Here, Plaintiff does not

advance any facts to suggest that the letter was drafted after her meeting with Himes. Accordingly, Defendants are entitled to summary judgment on the ELCRA retaliation claim.

## VI.

Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  42 U.S.C. § 1983.  As a general matter,  a claim under § 1983 has two elements: "(1) the violation of a right secured by the federal Constitution or federal law (2) that was committed by a person acting under color of state law."  *Brown v. Matauszak*, 415 F. App'x 608, 611 (6th Cir. 2011) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

In this case, Plaintiff brings two § 1983 claims, alleging Defendants violated her Fourteenth Amendment right to privacy and her First Amendment right to report a matter of public concern.   Defendants, for purposes of this motion, concede that they were acting under color of state law, writing that they "are not asking this Court to decide at this time whether [Alpena] is a government entity, or whether [Alpena] is liable for the alleged unconstitutional actions of its employees because the challenged decision was not a policy of the organization." Defs.' Br. 14 n.5 (emphasis omitted).  Consequently, the alleged constitutional violations  of each § 1983 claim is addressed in turn.

## A.

## 1.

The founders, Justice Louis Brandeis once observed, "knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. . . . They conferred, as against

the government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting). "The Constitution," of course, "does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R[ailway] Co. v. Botsford*, 141 U.S. 250, 251 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe v. Wade*, 410 U.S. 113, 152 (1973).

These "zones of privacy," the Court elaborated in *Whalen v. Roe*, 429 U.S. 589 (1977), "involve[] at least two different kinds of interests." *Id.* at 599. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Id.* at 599–600 (footnote omitted). As an example of the former type of interest — the type of interest implicated in this case — the Court in *Whalen* cited not only to Justice Brandeis's dissent in *Olmstead*, but also to the majority decision in *Griswold v. Connecticut*, 381 U.S. 479 (1965). 429 U.S. at 599 n.25. In *Griswold*, in turn, the Court held unconstitutional a state statute that prohibited giving contraceptives to married persons, explaining that although the right to "marital privacy" is not explicit in the text of the constitution, "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance." 381 U.S. at 484.

The Sixth Circuit, construing *Whalen* and progeny "narrowly," holds that the penumbral constitutional protections for personal privacy emanate only from brightly-defined sources. *Barber v. Overton*, 496 F.3d 449, 455 (6th Cir. 2007). That is, the substantive due process right "to avoid state disclosure of highly personal matters" — the right to informational privacy — "has been construed narrowly, only protecting citizens from disclosure when the circumstances

-24-

implicate personal rights that can be deemed fundamental or implicit in the concept of ordered liberty." *Id.* (internal citation and quotation marks omitted) (quoting *J.P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir. 1981)); *see also DeSanti*, 653 F.2d at 1091 ("[N]ot all rights of privacy or interests in nondisclosure of private information are of constitutional dimension, so as to require balancing government action against individual privacy. As with the disclosure in *Paul v. Davis*, [424 U.S. 693 (1976),] protection of appellants' privacy rights here must be left to the states or the legislative process.").

"Applying these standards," the Sixth Circuit observes, "this court has recognized an informational-privacy interest of constitutional dimension in only two instances: (1) where the release of personal information could lead to bodily harm (*Kallstrom* [v. *City of Columbus*, 136 F.3d 1055 (6th Cir.1998)]), and (2) where the information released was of a sexual, personal, and humiliating nature (*Bloch* [v. *Ribar*, 156 F.3d 673, 683 (6th Cir.1998))." *Lambert v. Hartman*, 517 F.3d 433, 441 (6th Cir. 2008). In *Bloch*, for example, the Sixth Circuit held that "the constitutional right to informational privacy was triggered by a press conference in which the sheriff released the 'highly personal and extremely humiliating details' of the rape to which Bloch had been subjected, some of which were 'so embarrassing she had not even told her husband.'" *Lambert*, 517 F.3d at 441 (quoting *Bloch*, 156 F.3d at 676). Concluding that the plaintiff could invoke her Fourteenth Amendment right to privacy, the court explained "sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood." *Bloch*, 156 F.3d at 685. "[T]his court's holding in *Bloch*," the Sixth Circuit later explained, "was premised on the notion that the disclosure of private sexual

information implicated a 'fundamental right or one implicit in the concept of ordered liberty' — namely the fundamental right of privacy in one's sexual life." *Lambert*, 517 F.3d at 441.[6]

In this case, the HealthWise form asked Plaintiff a number of questions regarding her private sexual life. The questions included, among other things, whether she experienced pain during sex, whether she was pregnant, had ever been pregnant, or was planning to become pregnant; whether she had ever had an abortion, miscarriage, or live birth, and if so, how many times; and whether she was on birth control and, if so, what type. This information may not be as "humiliating"[7] as the information elicited in *Bloch* — thus, this is a somewhat closer case than *Bloch*. Indisputably, however, the questions HealthWise asked concern private sexual information, and thus implicate Plaintiff's constitutional right of privacy. Accordingly, under *Bloch*, a general substantive due process right to informational privacy extends to these topics.

Adding a layer of complexity to the foregoing analysis, however, is the relationship between the Plaintiff and Defendants. When acting as an employer, rather than as a sovereign, the government enjoys greater latitude to inquire into personal matters of its employees. *NASA v. Nelson*, 131 S. Ct. 746, 757–58 (2011). "This distinction is grounded on the 'common-sense realization' that if every 'employment decision became a constitutional matter,' the Government could not function." *Id*. at 758 (internal quotation marks omitted) (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)). This is not to suggest that public employees surrender their

---

[6] As an aside, it should be noted that as a matter of federal constitutional law, the Court has established that pregnancy is a fundamental right. *See, e.g.*, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) ("Marriage and procreation are fundamental"). Contraceptive use, the Court has likewise established, is a fundamental right. *See, e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (noting the fundamental right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"). And, although controversial, abortion too has been deemed a fundamental right. *See, e.g.*, *H.L. v. Matheson*, 450 U.S. 398, 434 (1981).

[7] Although it is an open question whether information regarding, for example, previous abortions or miscarriages, and other intimate details of a person's private sexual life may also reasonably be viewed as "humiliating."

-26-

constitutional rights when they accept a position with the government.   Rather, the Supreme
Court explains:

> Our precedent in the public employee context . . . establishes two main principles:
> First, although government employees do not lose their constitutional rights when
> they accept their positions, those rights must be balanced against the realities of
> the employment context. Second, in striking the appropriate balance, we consider
> whether the asserted employee right implicates the basic concerns of the relevant
> constitutional provision, or whether the claimed right can more readily give way
> to the requirements of the government as employer.

*Engquist v. Or. Dept. of Agric.*, 553 U.S. 591, 598 (2008).   Applying this balancing test in
*Nelson*, for example, the Court held that the government's request regarding employee drug use
was permissible as a "reasonable, employment-related inquir[y]."   131 S. Ct. at 759.   "The
Government has good reason to ask employees about their recent illegal-drug use," the Court
wrote, explaining: "Like any employer, the Government is entitled to have its projects staffed by
reliable, law-abiding persons."  *Id.*

Similarly, in *Hughes v. City of N. Olmstead*, 93 F.3d 238 (6th Cir. 1996), the Sixth
Circuit held that a police department could inquire into the status of the marriage of a male
officer accused of sexual harassment.  *Id.* at 242.   A female officer had complained that the male
officer had harassed her and "had made references to his 'open marriage,' and stated that it was
'too bad that she was married.' "  *Id.*   "[I]n light of the accusations leveled against [the officer],"
the court wrote, "the department's investigation was not unreasonable.   The police investigated
[the officer] because of claims that he had committed acts of sexual misconduct while on duty,
an accusation which certainly related to whether [the officer] was conducting himself
appropriately as a police officer."  *Id.*   The court also distinguished its holding from *Briggs v.
North Muskegon Police Department*, 563 F. Supp. 585, (W.D. Mich. 1983), *aff'd*, 746 F.2d 1475
(6th Cir. 1984), in which the court held "that the dismissal of a married part-time police officer

-27-

from the police force for living with a married woman not his wife was a violation of that officer's privacy and associational interests." *Hughes*, 93 F.3d at 242 (citing *Briggs*, 563 F. Supp. at 592). "The significance of *Briggs*," the Sixth Circuit explained, "lies in the fact that the officer in that case was dismissed solely because of his living status, without any reference as to how that status could have affected his performance as an officer." *Id*.

In this case, unlike in *Nelson* and *Hughes*, the information sought in the HealthWise form regarding Plaintiff's private sexual life was not relevant to Plaintiff's job performance or related to her job functions. Indeed, although Defendants contend that "public employers may inquire about an employee's private sexual life . . . if the inquiry is job related," Defs.' Reply Br. 4, Defendants do not explain how their inquiry into Plaintiff's "private sexual life" is "related" to the job she applied for. Similarly unpersuasive is Defendants' argument that "Defendants did not ask any of the questions to which [Plaintiff] objects, nor did it instruct HealthWise to ask those questions." Defs.' Br. 19. As an issue of fact exists as to the degree of control Alpena was exercising over HealthWise's screening procedures, including the contents of its medical history form, Defendants are not entitled to summary judgment on Plaintiff's § 1983 claim alleging violations of her substantive due process right to privacy.

## 2.

Arguing in the alternative, Defendants contend that even if Alpena is not entitled to summary judgment on this issue, Shields and Himes are because of qualified immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818; *see also Davis v. Scherer*, 468 U.S. 183, 191

(1984) ("Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of [his] conduct as measured by reference to clearly established law." (internal quotation marks omitted)).

Tersely arguing that they are entitled to qualified immunity because they are not responsible for HeathWise's actions, Shields and Himes assert: "No case from the Sixth Circuit (or any other court) has held that a government employer violates an employee's right to informational privacy when a third-party vendor asks certain medical questions." Defs.' Br. 19. This legal proposition may be correct. As discussed above, however, a genuine issue of fact exists as to the degree of control Defendants' may have exercised over HealthWise's screening procedures, including the contents of the HealthWise form. Consequently, HealthWise may have been more than simply an independent "third-party vendor" for purposes of preemployment medical examinations — it may have been Alpena's agent.

Likewise, although both Shields and Himes asserted in their depositions that they were personally unaware of the contents of HealthWise's medical history form, they do not assert that they are entitled to qualified immunity because their lack of personal awareness — instead, their single qualified immunity argument is that HealthWise is an unaffiliated entity and therefore they cannot be held responsible for HealthWise's actions. For the reasons set forth above, this argument is unpersuasive. Accordingly, they are not entitled to qualified immunity on Plaintiff's § 1983 claim alleging violations of her substantive due process right to privacy.

**B.**

"A policeman may have a constitutional right to talk politics," Justice Oliver Wendell Holmes, Jr., observed at the close of the nineteenth century, "but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford*, 29 N.E. 517, 517 (Mass. 1892), *quoted in*

*Connick v. Myers*, 461 U.S. 138, 143–44 (1983).  In the twentieth century, however, the Court amended this traditional rule — policemen (and other public employees) now have the constitutional right to talk politics (and other types of protected expression) without fear of adverse employment action.  Since 1967, "it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."  *Connick*, 461 U.S. at 142 (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)).  This freedom of expression has been circumscribed in the public employment context, however, to encompass only matters of "public concern," with the Court explaining that the limitation

> reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter. . . . When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Connick*, 461 U.S. at 143, 146.  Accordingly, the Court instructs, "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  *Id*. at 147.

Consequently, for a public employee to establish a First Amendment retaliation claim, she must establish three elements:

> (1) that she was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of her constitutional rights.

*Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1408 (6th Cir. 2001) (internal alterations omitted) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000)).

Regarding the first element, whether speech addresses a matter of public concern depends on "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. "The point of the protection afforded public employees," the Sixth Circuit explains, "is to allow public employees a voice on issues actually affecting and interesting the community at large." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 966 (6th Cir. 2002). Speech complaining of discrimination, as a general matter, addresses matters of public concern. *See Strouss v. Mich. Dept. of Corr.*, 250 F.3d 336, 346 (6th Cir. 2001) (noting in dicta that First Amendment retaliation claim based on sex discrimination complaint would be viable because such complaints are a matter of public concern); *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000) (noting that race discrimination complaint made in the context of an internal grievance constituted a matter of public concern); *see generally Birch v. Cuyahoga Cnty. Probate Court*, 392 F.3d. 151, 168–69 (6th Cir. 2004) (collecting cases).

In this case, assuming Plaintiff establishes the first two elements — that her speech addressed a matter of public concern and that she suffered an adverse employment action which would have chilled the speech of a person of ordinary firmness — Defendants are nevertheless entitled to summary judgment on Plaintiff's claim because she does not establish the third element, causation. As with Plaintiff's ELCRA retaliation claim, Plaintiff does not advance any facts establishing that Defendants revoked Plaintiff's offer because of her complaints regarding

the questions in the HealthWise form.[8]   Rather, the undisputed evidence establishes that Defendants' drafted the letter revoking Plaintiff's employment before she complained to them about the questions contained in the HeathWise form.   On July 30, 2008, Himes sent a letter revoking the offer of employment to Plaintiff.   The same day, Plaintiff came to Himes's office and complained about the questions contained in the HeathWise form.   Plaintiff disagrees with when she was notified that the offer was withdrawn — she concedes, however, that on July 30 she was informed that she would get a letter informing her of "what was going on."   Pl.'s Dep. 78:13–15.   And she advances no facts suggesting that the letter was drafted after the meeting. Accordingly, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

## VII.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 22) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Defendant's motion for summary judgment on Plaintiff's ADA claim is **DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment on Plaintiff's Title VII claim is **DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment on Plaintiff's ELCRA retaliation claim is **GRANTED**.

---

[8] The causation regarding Plaintiff's retaliation claims, of course, are analytically distinct from Plaintiff's ADA and Title VII claims.   In these claims, Plaintiff alleges (in part) that her offer was revoked because she refused to answer facially discriminatory questions.   And she produces evidence supporting her allegations, such as the revocation letter Defendants sent to her.   In her retaliation claims, in contrast, Plaintiff alleges that the offer was revoked not because she refused to answer the questions posed by Lechel, but because she complained of their content to Himes.   That is, she complains that Himes, Shields, and Alpena directly discriminated against her, not through their purported agent.   As she has produced no evidence that her complaint motivated Defendants' decision, however, she has not established causation.

It is further **ORDERED** that Defendant's motion for summary judgment on Plaintiff's § 1983 Fourteenth Amendment substantive due process privacy claim is **DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment on Plaintiff's § 1983 First Amendment retaliation claim is **GRANTED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: December 2, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 2, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS

---